UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CATHLEEN GRAZIADIO,

                    Plaintiff,               13-cv-1082 (NSR)

  -against-                                OPINION AND ORDER

CULINARY INSTITUTE OF AMERICA,
SHAYNAN GARRIOCH, and
LOREEN GARDELLA,

                    Defendants.
------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

       Plaintiff Cathleen Graziadio ("Plaintiff") commenced this action by complaint filed February 15, 2013 and amended April 22, 2013, against Defendants Culinary Institute of America ("CIA"), Shaynan Garrioch ("Garrioch"), and Loreen Gardella ("Gardella") (collectively, "Defendants"). The amended complaint (dkt. no. 14) seeks damages and other relief for interference and retaliation under the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* (claims one and two), for associational discrimination under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* (claim three), and for associational discrimination under the New York Human Rights Law, N.Y. Exec. Law §§ 292 and 296 *et seq.* (claim four).

       By letter dated January 14, 2014, Plaintiff withdrew her claim under the New York Human Rights Law. Defendants now move for summary judgment on the remaining three claims pursuant to Federal Rule of Civil Procedure 56. Defendants' motion is GRANTED for the reasons outlined below.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/20/2015

1

## I. FACTS

The facts are gleaned from the parties' Rule 56.1 statements, declarations, and exhibits, and are not in dispute, except where so noted. CIA is the oldest culinary college in the United States, with a primary campus located in Hyde Park, New York. *See* Affirmation of Joseph J. Lynett ("Lynett Aff.") Ex. A ¶ 2. Garrioch has been employed by CIA since January 6, 2011, first as Director of Human Resources—Administration, and then as Direct of Human Resources. *Id.* Ex. B. at 5. Gardella has been employed as CIA's payroll manager since May 2007. *Id.* Ex. C at 6. Non-party Richard Mignault ("Mignault") is CIA's Vice President—Administration and Shared Services. *Id.* Ex. D at 6. Mignault had final decision-making authority for CIA's employment termination decisions. *Id.* at 23.

CIA maintains an employee handbook and policy governing employees' entitlement to leave under the FMLA and the administration thereof. *Id.* Ex. A at 44-47. The policy provides that a qualifying employee is "eligible to take a family care or medical leave of up to a maximum of 12 work weeks in any 12-month period" to handle health issues pertaining to the employee or her children. *Id.* at 44. The policy also requires that an employee requesting leave provide CIA "appropriate medical certification" from a health care provider within fifteen days of an unanticipated leave request, if practicable. *Id.* at 45.

CIA hired Plaintiff on April 17, 2007, to work as a Payroll Administrator—Student Payroll. *Id.* Ex. E at 53, Ex. F. Upon her hire, Plaintiff received a copy of the employee handbook containing CIA's FMLA policy. *Id.* Ex. G, H. Plaintiff reported directly to Gardella while with CIA. *Id.* Ex. E at 61.

In March 2012, Plaintiff requested and received FMLA leave on account of a work-related injury. *Id.* at 67-69, 71. Plaintiff returned to work thereafter. *Id.*

2

**A. Leave Requested for Vincent Graziadio**

On June 6, 2012, one of Plaintiff's two sons, Vincent Graziadio ("Vincent") was hospitalized for diabetes-related illness. *Id.* at 72. Plaintiff again took leave, and, on June 7, 2012, received from CIA the United States Department of Labor's FMLA Designation Notice, Notice of Eligibility and Right and Responsibilities, and a Medical Certification form. *Id.* at 75-77. Plaintiff concedes that she received these materials. *Id.* at 76. The notices and form stated that, upon request, an employee must provide a certification to support the need for FMLA leave. *Id.* Ex. M.

Plaintiff was on leave from the date of Vincent's hospitalization, June 6, 2012, until her return to work on June 18, 2012. After her return, on or about June 27, 2012, she provided CIA a medical certification supporting that leave. *Id.* Ex. E at 78-80, Ex. M. The certification she provided also indicated that future intermittent leave to care for Vincent would be needed, and estimated the term of care as "7 days per week from now through lifetime." *Id.* Ex. M. The parties agree, however, that Plaintiff did not request any further leave to care for Vincent thereafter.[1] *Id.* Ex. E at 80. Regarding the leave already taken for Vincent, CIA never expressly approved it as FMLA leave, but the company counted the days taken against Plaintiff's annual FMLA leave allotment and communicated the same to Plaintiff, thus impliedly approving it, at least in the first instance. *See id.* Ex. T.

**B. Leave Requested for T.J. Graziadio**

On June 27, 2012, Plaintiff's other son, T.J. Graziadio ("T.J.") reportedly fractured his leg, and that same day, Plaintiff told Gardella that Plaintiff would not be returning to work for

---

[1] In a declaration submitted with opposition briefing, Plaintiff states that she took approximately five hours' leave to care for Vincent the week she returned in June 2012, although this assertion is inconsistent with her deposition testimony, and, in any event, is not of great moment for reasons discussed below.

3

the remainder of the week. *See id.* Ex. N, O.  The following week, on July 2, 2012, Plaintiff told Gardella she would not be in for the remainder of that week either, on account of T.J.'s injury, and referenced FMLA documentation Plaintiff had left in her desk drawer. *Id.* Ex. Q.  Gardella responded on July 5, 2012 by confirming receipt of the documentation, which pertained to the earlier leave taken for Vincent's illness, and told Plaintiff she had 196.75 hours of FMLA time remaining. *Id.* Ex. T.

Expecting Plaintiff to return to work on July 9, 2012, when she did not do so, Gardella emailed Plaintiff asking for an update. *Id.* Ex. U.  Early evening on July 9, 2012, Plaintiff emailed Gardella and requested permission to return to work on a part-time basis, three days per week, until August 2012 or so. *Id.* Ex. V.  In the meantime, CIA had approved the hire of a temporary employee to replace Plaintiff. *Id.* Ex. S.

Thereafter, while Plaintiff remained absent, Gardella consulted with colleagues and referred the matter to Garrioch.  On July 17, 2012, Garrioch sent Plaintiff a letter taking issue with the documentation (or lack thereof) supporting:  (a) the prior request for prospective intermittent leave for Vincent; and (b) the more recent leave for T.J.  *Id.* Ex. Y.  Garrioch requested that Plaintiff provide supplemental documentation supporting both leave requests within seven days, and Garrioch warned of potential employment action absent receipt of such documentation.  *Id.*  In response to Garrioch's letter, Plaintiff sent a series of emails indicating confusion with the request for further documentation.  *See* Ex. Z.  In a July 19, 2012 email, Plaintiff said she intended to return to work on July 24, 2012 under her proposed, modified work schedule of three days per week.  *Id.*

On July 20, 2012, Garrioch emailed Plaintiff a Department of Labor informational brochure and an explanation of the deficiencies in Plaintiff's documentation.  *Id.* Ex. AA ("For

the documentation you have provided [concerning future intermittent leave for Vincent], it does not include the estimate of how much time you will need for each absence, how often you will be absent, and information establishing the medical necessary [sic] for taking such intermittent leave."). On or about July 23, 2012, Plaintiff submitted a second medical certification, signed by a health care provider, further explaining the potential need for future intermittent leave for Vincent, and a medical note regarding T.J.'s injury. *Id.* Ex. E at 125, Ex. BB, CC. The note regarding T.J. was scant of detail—it requested that Plaintiff be allowed to work three days a week for the following two weeks, but it did not certify the need for Plaintiff's prior absence for T.J., which began on June 27, 2012, and it did not say the proposed three-day schedule was medically necessary either. *Id.* Ex. CC.

On July 23, 2012, Garrioch advised Plaintiff that the documentation provided was inadequate to support the leave taken for T.J., or to support the request to work part-time. *Id.* Ex. EE. Garrioch proposed a meeting to resolve outstanding issues and requested that Plaintiff propose three dates and times. *Id.* A series of emails ensued, in which Garrioch reiterated the request for Plaintiff to propose dates and times to meet. *Id.* Ex. FF. Plaintiff provided none, but rather, responded that she was available to meet "any time." *Id.* Ultimately, on August 1, 2012, Plaintiff requested that she be allowed to return to work full time, but Garrioch said a meeting was required since Plaintiff's absences had not been authorized. *Id.*

On August 7, 2012, CIA received a letter from Plaintiff's counsel, Joseph J. Ranni ("Ranni"), requesting that Plaintiff be allowed to return to work and representing that Plaintiff would provide any necessary documentation. *Id.* Ex. GG. CIA's attorney, Joseph J. Lynett ("Lynett"), responded to Ranni by email on August 30, 2012, and advised that "if Plaintiff wants to return to work . . . she must contact her supervisor to arrange for her return to work." *Id.* Ex.

HH.  Lynett also said Plaintiff needed to "provide two sufficient and complete FMLA medical certification forms," instead of the documentation previously provided.  *Id.*  On August 30, 2012, the email from Lynett to Ranni was forwarded directly to Plaintiff.  *Id.*

Thereafter, Plaintiff did not contact her supervisor to arrange for her return to work.  *Id.* Ex. E at 212.  Plaintiff concedes this, although she argues the lack of contact was because she was dealing with CIA attorney-to-attorney by then.  *Id.*  Two weeks passed following Lynett's directive that Plaintiff should provide complete certifications and contact CIA to arrange a return to work, at which point Mignault approved CIA's decision to terminate Plaintiff's employment.  Garrioch notified Plaintiff of that decision by letter dated September 11, 2012.  *Id.* Ex. II.  The stated basis for the termination decision was that Plaintiff "had not contacted [her] supervisor to arrange to return to work," thus demonstrating a desire not actually to return to work (while saying otherwise) and instead to negotiate a severance package to which she was not entitled.  *Id.*

## II.     SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 states, in pertinent part:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party also may support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party, which must identify "specific facts showing that there is a

6

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting Fed. R. Civ. P. 56); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 244 (S.D.N.Y. 2001).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013); *Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir. 2005)). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) ("The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact."). Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.

### III.   DISCUSSION

#### A.   FMLA Claims

As a threshold matter, Defendants argue that neither Gardella nor Garrioch qualifies as Plaintiff's "employer" within the meaning of the FMLA. "A person can face individual liability under the FMLA only if that person is an 'employer.'" *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 365 (S.D.N.Y. 2012). Such person can include "any person who acts directly or indirectly in the interest of an employer to any of the employer's employees." *Id.* (quoting 29 C.F.R. § 825.104(d)). Courts employ an "economic reality" test to determine

whether an individual qualifies as a person acting "in the interest" of an employer, considering whether the alleged employer "'(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Id.* (quoting *Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).

In briefing, Plaintiff concedes that Gardella is not an employer within the meaning of the FMLA. As such, the Court grants Gardella's motion for summary judgment on the FMLA interference and retaliation claims. In contrast, Plaintiff argues that Garrioch is an employer and that Mignault's ultimate discretion over employment termination decisions is not dispositive. That is true. The power to hire and fire employees is but one factor. *Malena*, 886 F. Supp. 2d at 365. But Plaintiff's assertion that Mignault's approval of Plaintiff's termination "is irrelevant and a ruse given his total non-participation in the decision" is unsupported by record evidence. Plaintiff cites deposition excerpts that are, at most, equivocal on the interplay between Mignault's termination authority and Garrioch's participation in the termination decision, *see* Declaration of Nathaniel K. Charney ("Charney Decl.") Ex. 15 at 26-28, 33, 46, 54, and Plaintiff conveniently ignores the portion of Mignault's testimony where he confirmed that all termination decisions eventually rested with him and that he did, therefore, participate in the decision, *see* Lynett Aff. Ex. D at 23 (Q: "So your testimony is you were involved in the decision to terminate . . .? A: "Yes."); *see also* Charney Decl. Ex. 13 ("That was a [termination] decision that was made between myself and Richard Mignault.").

Beyond that, Plaintiff has proffered no evidence, aside from Garrioch's title as director of human resources, demonstrating that Garrioch supervised or controlled employee work schedules or conditions of employment, determined the rate and method of employee payment,

8

or maintained employment records.  *Malena*, 886 F. Supp. 2d at 365.  Plaintiff having not done so, testimony that termination authority rested with Mignault compels the conclusion that Garrioch was not an employer under the economic reality test, thus barring any FMLA claim against Garrioch.  *See Anderson*, 477 U.S. at 248 (onus shifts to non-moving party to demonstrate genuine issue for trial, upon moving party fulfilling preliminary burden).  The Court grants Garrioch's motion for summary judgment on the FMLA interference and retaliation claims.

### 1. Interference Claim Against CIA

As for CIA, the FMLA prohibits employers from interfering with their employees' ability to take FMLA leave.  *See* 29 U.S.C. § 2615(a)(1) ("It shall be unlawful for any employee to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.").  Interfering with the exercise of an employee's rights includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.  29 C.F.R. § 825.220(b); *see also Potenza v. City of N.Y.*, 365 F.3d 165, 167 (2d Cir. 2004).  An employee may bring an interference claim against the employer when "the employer in some manner impeded the employee's exercise of [the] right[s] afforded substantive protection under the FMLA." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 176 (2d Cir. 2006) (citation omitted).  To state a prima facie claim for interference under the FMLA, the plaintiff must allege that:  (1) she is an eligible employee; (2) the defendant qualifies as an employer under the FMLA; (3) the plaintiff was entitled to take leave under the FMLA; (4) the plaintiff gave notice to the defendant of her intention to take leave; and (5) the defendant denied the plaintiff benefits to which she was

entitled under the FMLA. *Brown v. The Pension Bds., United Church of Christ*, 488 F. Supp. 2d 395, 408 (S.D.N.Y. 2007).

The parties agree that elements one, two, and four of an FMLA interference claim against CIA are satisfied. The dispute centers on elements three and five—whether Plaintiff was entitled to take leave, and whether CIA, through Garrioch, Gardella, or another employee, denied or discouraged leave to which Plaintiff was entitled by improperly obstructing her return to work. CIA argues that it provided Plaintiff all benefits she was due, but Plaintiff challenges this.

Arguments concerning Plaintiff's diabetic son Vincent are largely a distraction. Communication about the leave for Vincent was muddled, and perhaps for that reason, Garrioch incorrectly testified that CIA had not at least impliedly approved FMLA leave taken in June 2012 for Vincent's hospitalization. Garrioch also thought that Plaintiff had not returned to work after the leave for Vincent, *see* Charney Decl. Ex. 13 at 93, which is incorrect. Plaintiff returned to work on June 18, 2012.

Any dispute regarding leave for Vincent centers on the adequacy of the medical certification submitted on or about June 27, 2012, after Plaintiff returned to work and shortly before her absence for T.J. *See* Charney Decl. Ex. 13 at 107. The certification included an indefinite, prospective request for intermittent FMLA leave for the remainder of Vincent's lifetime. *See* Lynett Aff. Ex. M. When Garrioch took control of the communication, she concluded that the June 27, 2012 medical certification did not adequately support the request for *future* leave. This conclusion was somewhat obvious since the request was totally vague, prospective, and indefinite, to the point where no employer reasonably would have approved it. Garrioch communicated that to Plaintiff, albeit in July 2012, after Plaintiff had taken additional leave for T.J. which prompted CIA's scrutiny of the documentation. *See* Lynett Aff. Ex. Y. Any

10

subsequent dispute regarding the adequacy of support for future leave for Vincent is largely irrelevant, however, because Plaintiff never attempted to draw down on that prospective leave request[2] and because the absence of documentation supporting leave taken for T.J. drove the conversation thereafter. Because she never actually sought to take additional leave for Vincent, and because discussions concerning leave for T.J. superseded those for Vincent, it is difficult to see how CIA could have interfered with Plaintiff's alleged right to future leave for Vincent.

The interference claim, rather, is based principally on the dialogue that took place after June 27, 2012, while Plaintiff was on leave attending to T.J., pertaining to the leave taken for T.J.'s injury. It is undisputed that Plaintiff notified Gardella on June 27 that Plaintiff could not return to work for at least the remainder of the week. Lynett Aff. Ex. N, O. At that time, Plaintiff had received an FMLA Notice of Eligibility and Rights and Responsibilities (she received one pertaining to the leave for Vincent), and CIA was not required to provide another notice. 29 C.F.R. § 825.300(b)(3) (one notice within a twelve-month period suffices). The notice stated that CIA could request a medical certification, *see* Lynett Aff. Ex. M, and CIA's employee handbook and FMLA policy confirmed the same, operated as a standing request for a certification, and gave Plaintiff fifteen days after any leave request to provide one if practicable, *id.* Ex. A at 45.

Confirming what the employee handbook required, CIA expressly requested a medical certification for the leave for T.J. on July 17, 2012, after the matter had been referred to Garrioch. *See* Lynett Aff. Ex. Y. CIA was entitled to assert its right to a certification, even though more than five days had passed since Plaintiff noticed the leave, because it became questionable that Plaintiff had taken nearly a month's full-time leave for a child's fractured leg.

---

[2] One possible exception to this is the five days Plaintiff argues she took for Vincent the week she returned to work in June 2012, but even if taken, approval or non-approval of those days is tangential to the merits.

*See* 29 C.F.R. § 825.305(b) (a request for medical certification generally must be made "at the time the employee gives notice of the need for leave or within five business days thereafter," but a request may be made "at some later date if the employer has reason to question the appropriateness of the leave or its duration").  The duration of Plaintiff's leave for T.J. justified the late request for a medical certification.[3]

When Plaintiff responded to Garrioch's July 17, 2012 letter with confusion, *id.* Ex. Z, Garrioch sent Plaintiff an informational brochure and a further explanation of the deficiencies in past documentation provided for Vincent (i.e., failure to note specific dates and times of future leave needed or why it was medically necessary), *id.* Ex. AA.  Thereafter, on July 23, 2012, Plaintiff submitted a supplemental certification concerning prospective leave for Vincent, *id.* Ex. BB, but she also submitted a patently inadequate note for T.J., which was silent with respect to the medical necessity of days already taken on T.J.'s account, *see id.* Ex. CC.  In other words, while demonstrating awareness of the certification requirement and the ability to provide more detailed information for Vincent, Plaintiff failed to do so for T.J.  This failure rendered the leave for T.J. unauthorized and stripped Plaintiff of any entitlement to return to work, unless and until she cured the defect.  *See Porter v. Potter*, No. 07-cv-124, 2010 U.S. Dist. LEXIS 145243, at *25 (E.D.N.Y. Jan. 20, 2010) (failure to submit supplemental medical documentation supporting leave requests despite opportunities to do so warrants denial of leave); *cf. Nichik v. New York City Transit Auth.*, No. 10-cv-5260, 2013 U.S. Dist. LEXIS 4692, at *36 (E.D.N.Y. Jan. 11,

---

[3] Plaintiff contends that before Garrioch took control of communication, CIA's payroll department had approved the leave for T.J., as demonstrated by an email response wishing Plaintiff "all the best" and by Excel spreadsheet coding applied by the payroll department which supposedly indicated that certain days in late June and July were, in fact, FMLA leave.  *See* Opposition Memorandum at 4.  The Court does not agree, however, that this leave conclusively was approved.  The "all the best" email was a mere pleasantry by any measure, and the payroll department's classification on the spreadsheets was a "first instance" determination.  *See* Charney Decl. Ex. 13 at 56-57.  Further, even if CIA had approved FMLA leave for certain days, the ever-extending duration of the leave made it reasonable and legal for CIA belatedly to seek a medical certification, to retract the approval prospectively, and to take adverse action thereafter.  *See* 29 C.F.R. § 825.305(b).

2013) ("defendants were entitled to request medical certification and delay restoring him to his position until it was provided") (citing 29 C.F.R. §§ 825.312(e), 825.313(d) (regarding fitness-for-duty certifications)); *Powell v. Metro One Loss Prevention Servs. Group, Inc.*, No. 12-cv-4221, 2013 U.S. Dist. LEXIS 111601, at *36 n.8 (S.D.N.Y. July 26, 2013) (same).

Plaintiff concedes that when CIA received the note for T.J., Garrioch immediately told Plaintiff it was defective. *See* Declaration of Cathleen Graziadio ("Graziadio Decl.") Ex. 32 ("[I]t says that the minor child can return to school. It does not state that there was any medical necessity for you to provide full time care."). And yet Plaintiff did not cure the defect. Understandably, in light of disjointed email traffic, Garrioch proposed an in-person meeting and expressly asked Plaintiff to provide three time slots. *Id.* There is nothing nefarious about Garrioch's request for an in-person meeting where email communication had failed. Although Plaintiff stated a willingness to meet, she did not provide any time slots, which was a seemingly noncontroversial task. On August 7, 2012, more than fifteen days after the July 17, 2012 request for documentation (and after Garrioch's July 20, 2012 follow-up with a brochure and explanation of deficiencies), Plaintiff's counsel, Ranni, stating a willingness to provide what documentation was required. Even through counsel, who presumably reviewed the note Plaintiff had submitted concerning T.J. and the email correspondence explaining why it was defective, Plaintiff did not provide further documentation on August 7.

On August 30, 2012, then more than a month after the original request for documentation, CIA's counsel, Lynett, gave what probably was the clearest directive to date: "provide two sufficient and complete FMLA medical certification forms" and have Plaintiff "contact her supervisor to arrange for her return to work." *Id.* Ex. GG. Inexplicably, Plaintiff and her counsel did neither. CIA was thus left with the aforementioned, skeletal note pertaining

to T.J.'s absence, which did not link days spent out of the office for T.J. with medical necessity. It may be that Plaintiff's counsel, Ranni, believed the default fifteen-day response period and any other stated deadlines were tolled by ongoing attorney-to-attorney discussions. *See* Opp. Mem. at 16 ("the notion of a return to work was on hold"). If he did, that belief was legally unfounded, as he made no attempt to memorialize an informal or formal tolling agreement which might have forestalled the adverse employment action of which Garrioch had warned one month earlier. CIA waited two additional weeks following the August 30, 2012 letter from Lynett to Ranni, a copy of which Plaintiff received. Despite the clear directive in that letter and in prior emails, Plaintiff did not provide supplemental documentation concerning T.J. and did not contact CIA to arrange a return to work.

On the evidence submitted, the Court finds no genuine issue of material fact concerning Plaintiff's failure to provide requested documentation pertaining to leave taken for T.J. or to follow stated protocol for arranging a return to work after the absence for T.J. Because Plaintiff failed to provide the requested documentation, CIA acted in accordance with the FMLA and with CIA's employee handbook in designating Plaintiff's continued absence unauthorized. Because the leave properly was so designated, a claim for interference by impeding reinstatement of employment does not lie. Plaintiff's failure to contact CIA in August 2012 to arrange a return to work further supports this conclusion. The Court therefore grants CIA's motion for summary judgment on the FMLA interference claim.

### 2. Retaliation Claim Against CIA

The above analysis applies with equal force to the FMLA retaliation claim against CIA. This claim too is grounded in the notion that CIA impeded Plaintiff's reinstatement of

employment and then terminated that employment based on her exercise of rights under the FMLA.

An FMLA retaliation claim invokes *McDonnell Douglas* burden-shifting. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff first must articulate a prima facie case of retaliation by demonstrating that: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. *Colon v. Fashion Inst. of Tech (State Univ. of N.Y.)*, No. 12-cv-7405, 2013 U.S. Dist. LEXIS 150268, at *15-17 (S.D.N.Y. Oct. 18, 2013). If Plaintiff does so, the burden shifts to CIA to articulate a non-retaliatory basis for the adverse employment action. *Esser v. Rainbow Adver. Sales Corp.*, 448 F. Supp. 2d 574, 581 (S.D.N.Y. 2006) (citing *Quarantino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir. 1995)). If CIA does so, Plaintiff must establish that the stated basis for the action is a mere pretext. *Id.*

Undisputed facts undercut Plaintiff's retaliation claim. The claim requires that a well-founded request for FMLA leave resulted in some adverse employment action, namely, the termination of Plaintiff's employment. Plaintiff concedes that she took leave in March 2012 for her own work-related injury and then in early-June 2012 for Vincent's hospitalization. Despite Garrioch's incorrect testimony to the contrary, CIA approved both instances of leave, at least impliedly. Plaintiff returned to work after both of those instances without incident, and mere proximity between the exercises of leave rights and the ensuing events is of limited relevance. *See O'Reilly v. Consol. Edison Co.*, 173 Fed. Appx. 20, 22 (2d Cir. 2006) (holding that temporal proximity between exercise of rights and termination of employment, although it may be sufficient to establish a prima facie case of retaliation, was not sufficient to establish pretext

overcoming evidence of a legitimate non-retaliatory basis for the adverse action) (citing *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998)); *see also Ben-Levy v. Bloomberg*, 518 Fed. Appx. 17, 19 (2d Cir. 2013) (holding that two-day temporal proximity between employee's complaint about discrimination and removal of employee from an important project, while enough to support a prima facie case of retaliation, was insufficient to establish pretext).

When it comes to the ensuing events—that is, the dialogue and the decisions made regarding the request for future intermittent leave for Vincent and for leave for T.J.—the record demonstrates that the adverse action eventually taken was taken because of concerns regarding documentation and because of Plaintiff's inaction. Plaintiff tries to create issues of fact concerning the basis for the termination decision, suggesting it was a decision made by Garrioch (the "terminator"), who was fed up with Plaintiff's repeated requests for FMLA leave. But arguments concerning Garrioch's purportedly-ill motivation are speculative and not grounded in any affirmative evidence. The email trail reveals, rather, that when consulted in July 2012, Garrioch noticed deficiencies in documentation concerning the leave requests. She communicated her concerns to Plaintiff and provided Plaintiff more than one opportunity to cure the deficiencies. There is no real dispute about this. At most, Plaintiff contends Garrioch was unclear and obstructionist in so communicating, but the written record does not bear this out.

The medical note for T.J., for example, was totally silent regarding the medical necessity for days already taken to care for him, and Garrioch explained that to Plaintiff the very same day Plaintiff submitted the note. *See* Graziadio Decl. Ex. 32. Plaintiff, having by then submitted two relatively detailed certifications for Vincent, knew or should have known the note pertaining to T.J. was inadequate. Even so, Garrioch communicated that to her, generally was responsive by email, and attempted to set up an in-person meeting when email traffic became dysfunctional.

Far from suggesting that the eventual termination decision was made with retaliatory intent, the evidence demonstrates a good faith attempt on CIA's part to address defects in documentation thus clearing a path to reinstate Plaintiff's employment. Ultimately, Plaintiff and her counsel stated a willingness to provide the missing documentation, and yet they never did so. Instead they attempted to negotiate a severance package to which Plaintiff was not entitled, while additional weeks ticked by. When, after a number of requests and directives, Plaintiff did not provide the appropriate documentation and did not contact CIA to arrange a return to work, CIA waited two weeks and then took adverse employment action.[4]

On the evidence presented, the Court finds no genuine issue of material fact concerning CIA's intent or the basis for the adverse employment action. Even assuming arguendo that Plaintiff has put forth a prima facie case of retaliation, CIA has submitted evidence establishing legitimate, non-discriminatory bases for terminating Plaintiff's employment: deficiencies in documentation supporting FMLA leave requests and leave taken; and a failure to contact CIA to arrange a return to work. *Cf. Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 731 (S.D.N.Y. 2012) (job abandonment precludes retaliation and discrimination claims under Title VII and the

---

[4] The Court notes that the New York State Department of Labor (the "DOL") determined on November 1, 2012—albeit without holding an evidentiary hearing—that Plaintiff was eligible for unemployment benefits despite CIA's assertion that she was terminated for cause and therefore was ineligible. *See* Charney Decl. Ex. 11. In a summary order, presumably having reviewed evidence similar to what is before this Court, an unnamed labor services representative at the DOL stated a view that Plaintiff "did all she could to protect her job and was told she could not" do so. *Id.* Judges in this district previously have admitted such DOL findings at jury trials in employment discrimination cases and have afforded the findings weight on summary judgment. *See, e.g.*, *Altman v. Port Auth. of New York & New Jersey*, 879 F. Supp. 345, 349 (S.D.N.Y. 1995); *Fitch v. R.J. Reynolds Tobacco Co.*, 675 F. Supp. 133, 138 (S.D.N.Y. 1987). Here, however, the Court does not agree with the DOL's conclusion that the file demonstrates an unequivocal desire and steps taken to return to work. Rather, the file unequivocally demonstrates a desire to return to work on Plaintiff's own terms (part-time), without providing sufficient medical certifications, and only if Plaintiff's counsel could not negotiate an adequate severance package. Further, the issue before the DOL was whether there was cause (i.e., misconduct) to terminate Plaintiff's employment, not whether the asserted failure to provide medical certifications and to arrange a return to work were pretext for FMLA-based retaliation or disability-based discrimination. That distinction lessens the import of the DOL finding. *See Gore v. R.H. Macy & Co.*, No. 86-cv-9684, 1989 U.S. Dist. LEXIS 6578, at *7-8 (S.D.N.Y. June 13, 1989). On the whole, the finding does not disturb this Court's conclusion that the record lacks evidence raising a material factual issue concerning retaliatory or discriminatory intent.

ADA); *see also Brown v. The Pension Bds.*, 488 F. Supp. 2d at 403 ("Certainly, an employer is entitled to discharge an employee who fails to follow company rules and fails to appear for work without notification, even if the absences are attributable to a medical problem."). There is insufficient evidence suggesting that these bases for termination were mere pretexts. Accordingly, the Court grants CIA's motion for summary judgment on the FMLA retaliation claim.

### B. ADA Claim

Finally, Plaintiff's ADA claim based on associational discrimination also does not raise material factual issues warranting a trial. The ADA prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b). This claim, like the FMLA retaliation claim, is subject to *McDonnell Douglas* burden shifting. *Moscarello v. Malcom Pirnie, Inc.*, No. 06-cv-5250, 2008 U.S. Dist. LEXIS 109002, at *10 (S.D.N.Y. Feb. 17, 2008). To state a prima facie case, Plaintiff must prove that (1) she was qualified for the job at the time of the adverse employment action, (2) she was subjected to an adverse employment action, (3) she was known at the time to associate with someone with a disability, and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision. *Id.* at *10-11. Plaintiff, moreover, must offer evidence that CIA was concerned about (a) the expense the disability would cause, (b) the possibility that the employee would become disabled in the future through the association, or (c) the possibility that that the

employee would be distracted by the disability.  *See Dessources v. American Conference Inst.*, No. 12-cv-8105, 2013 U.S. Dist. LEXIS 69406, at *6-7 (S.D.N.Y. May 14, 2013).

      As a threshold matter, associational discrimination based on a child's disability requires a legally cognizable disability.  The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  This definition does not encompass T.J.'s temporarily fractured leg, and Plaintiff has submitted no authority to the contrary.  Rather, the only potential disability is Vincent's diabetes, and the only possible discrimination theory is that CIA terminated Plaintiff out of concern that the diabetes would distract her.  Undisputed evidence undercuts this theory, however.  As noted above, temporal proximity between Vincent's diagnosis and Plaintiff's termination, although it may support a prima facie case, is not sufficient evidence of pretext.  *O'Reilly*, 173 Fed. Appx. at 22; *Ben-Levy*, 518 Fed. Appx. At 19.  Moreover, CIA reinstated Plaintiff's employment on June 18, 2012 – after learning of Vincent's diabetes – and expressed a desire to get her back into the office quickly while approving the hire of a mere temporary employee to replace her when she took leave for T.J.  *See* Lynett Aff. Ex. S, X.  The reinstatement, the attempt to get her back into the office, and the search for a temporary replacement undercut the notion that the diabetes was a determining factor in CIA's subsequent decision to terminate Plaintiff's employment.

      The record demonstrates, rather, that when Plaintiff repeatedly extended her absence to care for T.J. and then requested a part-time return, Garrioch and CIA scrutinized the medical documentation and concluded that it did not support the leave taken for T.J. or the earlier request for future intermittent leave for Vincent.  Garrioch communicated that to Plaintiff, but Plaintiff and her counsel did not timely cure the problem, and ultimately Plaintiff did not contact CIA to arrange a return to work.  As above for the FMLA claims, the evidence does not raise genuine

issues of material fact concerning associational discriminatory motivation. Even assuming arguendo that Plaintiff has stated a prima facie case, there is insufficient evidence of pretext overriding the proof of legitimate bases for Plaintiff's termination. Accordingly, the Court grants Gardella, Garrioch, and CIA's motion for summary judgment on the ADA claim.

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is GRANTED in its entirety. The Clerk of Court is respectfully requested to terminate the action.

Dated:   March 20, 2015                              SO ORDERED:
         White Plains, New York

                                                     _____
                                                     NELSON S. ROMÁN
                                                     United States District Judge